OSCN Found Document:PHILLIPS v. NATIONAL OILWELL VARCO

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 PHILLIPS v. NATIONAL OILWELL VARCO
2024 OK CIV APP 4
Case Number: 120288
Decided: 05/17/2023
Mandate Issued: 02/01/2024
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II

Cite as: 2024 OK CIV APP 4, __ P.3d __

 

RICHARD W. PHILLIPS and ERIC C. MULLEN, Plaintiffs/Appellants,
v.
NATIONAL OILWELL VARCO, LP, and BRADY AUSTIN ALMAGUER, Defendants/Appellees.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE DON ANDREWS, TRIAL JUDGE

AFFIRMED

Clifton D. Naifeh, NAIFEH & ASSOCIATES, Norman, Oklahoma, for Plaintiffs/Appellants

Jason A. Ryan, Chance L. Pearson, RYAN WHALEY COLDIRON, JANTZEN PETERS & WEBBER PLLC, Oklahoma City, Oklahoma, for Defendants/Appellees

STACIE L. HIXON, JUDGE:

¶1 Richard W. Phillips (Phillips) and Eric C. Mullen (Mullen, collectively "Plaintiffs") appeal a judgment following jury verdict in their favor of $6,190.56 and $5,000.00 respectively against Defendants Brady Austin Almaguer (Almaguer) and employer National Oilwell Varco, L.P. (NOV).[1] Plaintiffs assert the trial court erred by consolidating their claims arising from the same motor vehicle accident; by granting directed verdict on punitive damages; that Defendants' counsel's statements at trial unfairly prejudiced the jury; and that the damage award was clearly inadequate as a result of passion or prejudice. On review of the record and the briefing of the parties, we affirm the trial court's judgment of February 22, 2022.

BACKGROUND

¶2 On March 11, 2013, Almaguer was working as a field service technician for NOV, placing products on drilling rigs. He left a well site at around 12:15 p.m., driving south on two-laned Karns Road in Canadian County, toward the intersection with U.S. Highway 66. Plaintiffs traveled ahead of Almaguer. Their driver, Mullen, stopped before the stop sign to allow a semi-tractor trailer room to turn left onto Karns Road. Almaguer failed to stop in time and struck the right rear of Plaintiffs' truck.

¶3 Phillips filed this action for negligence against Defendants in Oklahoma County in December 2014. Mullen filed in Canadian County on the same day. His action was transferred and consolidated with Phillips' but was voluntarily dismissed before Pretrial Conference in November 2019. On refiling, the trial court again consolidated the actions and proceeded to a five-day jury trial in November 2021 on negligence and negligent entrustment.[2]

A. Almaguer's employment and the 2013 accident

¶4 Defendants admitted Almaguer's fault for the accident by the time of trial. Plaintiffs proceeded on a theory that Almaguer was distracted by something at the time of the accident--fatigue, technology, or the influence of drugs or alcohol, and that Defendants were negligent in their entrustment of a vehicle to Almaguer, and/or perhaps responsible for his distraction.

¶5 In opening statements, Plaintiffs likened distracted driving to Russian roulette, and argued NOV chose to "recklessly distract" Almaguer through its alleged failure to enforce safe driving policies. Plaintiffs' first witness was NOV's corporate representative and safety director, David Anderson, who was questioned extensively on safety rules, company practices, the hazards of distracted driving, and Almaguer's background and safety training. Anderson testified Almaguer had received safety training, including driver safety training. At the time of the accident, Almaguer had no tickets, no points on his driver's license and no prior accidents. Almaguer's truck was equipped with a speed tracker and a GPS tracker which sent NOV notifications if its technician was driving outside of expectations. Though Plaintiffs suggested repeatedly at trial that Almaguer was distracted by a cell phone, a computer, by fatigue, or drugs and alcohol, they presented no evidence to support their reckless distraction theory at trial.

¶6 With respect to the accident itself, it was undisputed that Plaintiffs' truck stopped somewhere before it reached the stop sign to allow the semi-tractor trailer room to turn left. Almaguer testified that he came atop a hill on Karns Road, saw Plaintiffs' vehicle, took his eyes off of it to watch the semi turning left onto Karns Road, and struck Plaintiffs from behind.

¶7 Defendants described Almaguer throughout trial as following too closely. However, Plaintiffs argued that Almaguer was traveling around 45 m.p.h. at the time of the collision based on prior deposition testimony in which he stated he was traveling the speed limit when he crested the hill and saw Plaintiffs.[3] Almaguer testified he applied his brakes and steered right to avoid the collision. Consistent therewith, Plaintiffs' accident reconstruction expert, Ed Onley, opined that Almaguer was not traveling at a high rate of speed, and tried to avoid the accident by steering right, but could not stop. The bumper of Almaguer's pickup showed a dent. His airbags did not deploy. The heavy steel bumper of Mullen's work truck was dented, apparently interfering with an adjoining compartment door, which Mullen stated before the jury appeared in the photos to be "a little miniscule."[4] The parties drove from the scene. The investigating highway patrol trooper observed no injuries and the parties stated they were not injured. Both the trooper and Mullen testified they noticed no sign that Almaguer was impaired.

B. Plaintiffs' injuries

¶8 Though Plaintiffs declined medical treatment at the scene, both complained of neck or back pain in the weeks thereafter. Both pursued workers' compensation claims and were determined to be permanently partially disabled in varying degrees. Evidence of their awards was not presented at trial, though Plaintiffs presented witnesses who testified to impairment ratings from the workers' compensation proceedings.

1. Phillips

¶9 Phillips, then 71, complained of a neck injury at trial. He presented neurosurgeon Dr. Reynolds, who testified the accident aggravated pre-existing, advanced degenerative arthritis of the spine.[5] Dr. Reynolds testified Phillips told him he was involved in a minor accident and bumped by behind. Relying on Phillips' account that he was previously asymptomatic, Dr. Reynolds opined the accident triggered his neck pain, but never asked Phillips about prior neck pain or consulted his medical records.

¶10 Phillips also called family practice physician Dr. Rosson,[6] who opined Phillips sustained 24.76% permanent partial disability as a result of injury to the neck. Dr. Rosson opined that due to the combination of that injury and previous work-related injuries, Phillips was 100% disabled and economically unemployable. In contrast, Phillips acknowledged his treating physicians told him he could work light duty.

¶11 Phillips initially testified at trial that he had no neck pain before the accident. In addition, he conceded he may have told his treating spine specialist Dr. Fong he had no prior neck injuries, although he had been adjudicated to have a partial disability or impairment of the neck after a previous work injury. [7] Phillips then acknowledged neck pain was perhaps a "fraction" of his pre-existing problems.

¶12 As demonstrated at trial, Phillips had testified during depositions that he was not on medication before the accident. However, Defendants presented evidence that Phillips was on prescription medication before the accident, including Celebrex for general arthritis, and had been prescribed 100 Lortab two weeks before the accident. Phillips denied taking the Lortab, apparently contrary to medical records referencing him taking his last dose six months after it was prescribed.

¶13 At trial, Phillips described his pain like being stabbed with an ice pick; he could barely stand the pain. Medical records a couple of weeks after the 2013 accident described him as sore. He was referred for three months' physical therapy, which reportedly reduced his pain in a few days. He met his pain goal in one month. Dr. Reynolds testified Phillips stopped therapy after one month because he said he did not think it made a significant difference and he did not need to return to work. 

¶14 By the time of trial, Phillips had not returned to Dr. Reynolds in seven years and had not sought further treatment, other than continuing his prescription for Celebrex. Phillips testified he was not seeking recovery for medical bills, or future medical care.

2. Mullen

¶15 Mullen, who was 32 at the time of the accident, did not immediately feel back pain after the accident, and denied pain prior to the accident, other than a few chiropractor visits. He was referred to Dr. Foster in April 2013, after complaining of pain in the low back and neck. Dr. Foster noted Mullen had minimal discomfort and a little bit of a restricted range of motion. He found no neurologic abnormalities, x-rays were normal, and prescribed physical therapy and anti-inflammatory medication. Though his examinations were normal, Mullen continued to complain of pain. Thus, Dr. Foster obtained an MRI in May 2013. He testified the MRI showed no acute compression deformities, but he did have mild degenerative disc changes of the mid-thoracic spine, mild disc bulging or protrusions at C6-C7 and T9-T10 without central canal stenosis, and a schmorl's node at the T8 level.[8] He testified Mullen's MRI was "physiologic," not normal, i.e., not out of the ordinary for a person of his age in his type of work. Dr. Foster did not think the disc bulging was caused by the accident or that it had caused the schmorl's node because there should have been indications of trauma, such as surrounding edema in the vertebral body. While Mullen still had complaints, Dr. Foster found nothing he could do to improve him further, that he could continue to work without restriction, and determined he was at maximum medical improvement on June 24, 2013.

¶16 Following the MRI, Mullen was also sent to spine specialist, Dr. Fong. According to Dr. Rosson, Dr. Fong recommended a physiatry evaluation and treatment, i.e., non-surgical methods. Thereafter, Dr. Schick, a physical medicine and rehabilitation specialist, saw Mullen about nine months after the accident.

¶17 Dr. Schick determined Mullen had sustained a whiplash injury, suffered some kind of myofascial pain, and prescribed pain medication. One year after the accident, Mullen was working routine duty. He complained of pain between the shoulder and back, but his neck had improved significantly. In June 2014, Dr. Schick determined Mullen was at maximum medical improvement. He recommended he find a primary care physician to maintain medications on an as-needed basis, continue ibuprofen, home exercise, ice and heat as needed, indefinitely. Dr. Schick never placed Mullen on restrictions and his physical examination never indicated anything other than normal range of motion in Mullen's neck and no neurological issues.

¶18 Thereafter, Dr. Rosson saw Mullen for a disability evaluation on July 31, 2014. He testified Mullen exhibited tenderness in the lower thoracic region, mid to lower lumbosacral region, the musculature along the spine, along the right sacroiliac joint, with somewhat diminished reflexes, and some limitations on range of motion. Dr. Rosson reviewed Mullen's May 2013 MRI,[9] and opined that Mullen sustained from the accident chronic musculoligamentous injury with ongoing residual neurosensory injury to the cervical spine and thoracic spine, as well as multi-level disc derangement of the thoracic spine and thoracic myofascitis.[10] Dr. Rosson testified Mullen was able to work and was not 100% permanently disabled but was permanently partially disabled 19% to the thoracic region, 18% to the neck and 21% as a result of the lumbar spine.[11]

¶19 By the time of Mullen's 2019 deposition, he had not sought any treatment for four years, other than over-the-counter pain medication. Eight years after the accident, Mullen testified he hurt every day since the accident, and sitting in the courtroom "hurt like hell." He testified he was seeing a physician for ibuprofen and muscle relaxers. Mullen continued to work. He did not seek recovery of his medical bills or lost wages.

¶20 At the close of Plaintiffs' evidence, the trial court granted directed verdict on liability for negligence to Plaintiffs, and to Defendants on punitive damages. Plaintiffs' claim for negligent entrustment against NOV and for actual damages were submitted to the jury. In closing, Plaintiffs' counsel requested the jury award $500,000 to Mullen and around $662,000 to Phillips, arguing Almaguer's repentance was fake and Defendants were making a "mockery of human suffering." Counsel suggested if the jury awarded anything less, Defendants would be in their corporate suites popping champagne, and thinking they got away with "another one." The jury awarded Mullen $5,000.00 and Phillips $6,190.56 in actual damages. The trial court entered judgment on February 22, 2022.

¶21 Plaintiffs appeal.

STANDARD OF REVIEW

¶22 A trial court has broad discretion to manage the orderly processing of litigation before it, and its decision whether or not to consolidate proceedings for trial will not be disturbed absent a clear abuse of discretion. State v. One Thousand Two Hundred Sixty-Seven Dollars, 2006 OK 15, ¶ 15, 131 P.3d 116. "An abuse of discretion occurs when a decision is based on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." Spencer v. Okla. Gas & Elec. Co., 2007 OK 76, ¶ 13, 171 P.3d 890 (emphasis omitted) (footnote omitted).

¶23 The trial court also has wide discretion in its limitation of the scope of opening and closing arguments. "There must be a showing that counsel's conduct substantially influenced the verdict and/or denied the defendant a fair trial."
Lerma v. Wal-Mart Stores, Inc., 2006 OK 84, ¶ 20, 148 P.3d 880.

A motion for directed verdict raises the question of whether there is any evidence to support a judgment for the party against whom the motion is made, and the trial court must consider as true all the evidence and inferences reasonably drawn therefrom favorable to the non-movant, and disregard any evidence which favors the movant.

Gillham v. Lake Country Raceway, 2001 OK 41, ¶ 7, 24 P.3d 858 (citation omitted).[12] "A demurrer to the evidence or motion for directed verdict should be granted only if the party opposing the motion has failed to demonstrate a prima facie case for recovery." Id. "This Court must review the record in a light most favorable to the plaintiff but will disturb the trial court's sustention of the directed verdict only if there is competent evidence to support the material elements of the plaintiff's cause of action." Id. The Court's standard of review of a trial court's grant of a demurrer or directed verdict is de novo. Computer Pub's, Inc. v. Welton, 2002 OK 50, ¶ 6, 49 P.3d 732.

¶24 "In an action at law, a jury verdict is conclusive as to all disputed facts and all conflicting statements, and where there is any competent evidence reasonably tending to support the verdict of the jury, this Court will not disturb the jury's verdict or the trial court's judgment based thereon." Florafax Intl, Inc. v. GTE Mkt. Res., Inc., 1997 OK 7, ¶ 3, 933 P.2d 282 (citations omitted).

ANALYSIS

A. Consolidation of Claims of Phillips and Mullen

¶25 Plaintiffs contend the trial court erred in consolidating their claims for trial. Title 12 O.S.2021, § 2018(C) provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

¶26 "Consolidation is a procedural mechanism to enhance the efficiency of judicial process and its economy." One Thousand Two Hundred Sixty-Seven Dollars, 2006 OK 15, at ¶ 15. Section 2018 provides for consolidation of actions that deal with common questions of law or fact, and is permissive in nature, and hence discretionary. Id.

¶27 It was clearly within the trial court's discretion to consolidate Plaintiffs' actions. They arose from the same accident and concern the same issues of law. Consolidation would plainly foster judicial economy. Yet, Plaintiffs assert that it was reversible error to consolidate claims of a "fault free" Plaintiff (Phillips) with a "fault-accused" Plaintiff (Mullen) under Oklahoma law.

¶28 In support, Plaintiffs rely on language in Graham v. Keuchel, 1993 OK 6, 847 P.2d 342, noting problems inherent in "combining for trial two completely separate claims against common defendants, where one is a parent's medical malpractice claim founded on negligence and the other is for injury to or wrongful death of a child." Id. at ¶ 35 (emphasis original). "When such claims are tried together, it is virtually impossible to assure that the parent's contributory negligence will be surgically excised from courtroom proceedings." Id. In that case, the trial court consolidated a mother's medical negligence claim in which she was alleged to be contributorily negligent, with the separate malpractice claim of her deceased newborn, to whom mother's negligence could not be imputed. The jury returned only one verdict form, on the mother's claim. The Court determined the jury was clearly confused on the issues to be decided on the wrongful death claim and directed the claims be bifurcated to ensure mother's contributory negligence was omitted from the jury's consideration of the child's claim.

¶29 Plaintiffs reason the circumstances in Graham are present here, and that there was a danger the jury was misled into believing the fault-free Phillips was partially at fault based on Mullen's actions. These arguments are without merit.

¶30 One, Defendants did not argue that Mullen was at fault for the accident, and no comparative or contributory negligence instructions were presented to the jury. Defendants informed the jury that Almaguer was at fault in opening statements. The trial court granted a directed verdict on the issue of liability, which was then reflected in the jury instructions. Mullen was never a "fault-accused" Plaintiff at trial.[13]

¶31 Additionally, Plaintiffs ignore a significant distinction between Graham and the instant case--Phillips was not a minor child. Graham does not hold that every claim of a "fault-free" plaintiff must be bifurcated from that of a plaintiff who was potentially contributorily negligent. Graham rests on distinguishable public policy "that the negligence of a parent may not be imputed to a child of tender years to bar or reduce the child's recovery against a third party," as well as the policy that a child may not ordinarily recover from a parent for his or her ordinary negligence, which prevented the parties from arguing mother's ordinary negligence as a supervening cause of the child's death. Id. at ¶ 12. Bifurcation thereafter was required because of the danger that "partial blame would impermissibly be assigned to the parent as obliquely concealed negligence in contravention of . . . [these] two public policy concepts." Id. at ¶ 12 n.29.

¶32 In contrast, both several liability and Oklahoma's comparative fault regime are well established. See e.g. 23 O.S.2021, §§ 13, 15; Oklahoma Uniform Jury Instruction No. 9.21 (OUJI 2014 Supp.); Myers v. Missouri Pac. R. Co., 2002 OK 60, ¶ 31, 52 P.3d 1014; Bode v. Clark Equip. Co., 1986 OK 21, ¶ 8, 719 P.2d 824; Davis v. CMS Cont'l Nat. Gas, Inc., 2001 OK 33, ¶ 5, n.4, 23 P.3d 288, as corrected (May 7, 2001). Further, the claims of driver and passenger, or multiple injured parties, against another negligent driver are brought together in Oklahoma courts with some regularity. See generally Burgess v. Friedman & Son, Inc., 1981 OK CIV APP 69, 637 P.2d 908; Berry v. Empire Indemn. Ins. Co., 1981 OK 106, 634 P.2d 718; Jackson v. Jones, 1995 OK 131, 907 P.2d 1067; Wagnon v. Carter, 1975 OK 9, 539 P.2d 735. If Mullen's fault for the accident had been an issue for trial, Oklahoma law would have required the jury to apportion fault between him and Defendants. Under 23 O.S.2011, § 15, Defendants would not have been liable to Phillips for Mullen's share of fault. In fact, if Defendants contended Mullen bore fault for the accident, they could have sought to apportion fault at trial, regardless of whether he was a party. Plaintiffs misapply Graham.

¶33 Additionally, unlike Graham, nothing of record suggests the jury was confused by the consolidation of Plaintiffs' claims into a single action. As addressed further herein, the jury awarded each Plaintiff damages in an amount which is firmly supported by competent evidence. Nothing of record suggests the jury was misled to believe Plaintiffs were at fault. The trial court did not abuse its discretion by consolidating these actions for trial.

B. Objections to Prejudicial Remarks in Closing Were Unpreserved

¶34 Plaintiffs contend they were prejudiced by closing arguments at trial that Defendants were not at fault, or were not reckless after fault was admitted and directed verdict granted on punitive damages, as well as their apparent description of the collision as an "accident.[14] Plaintiffs also argue that Defendants improperly argued in closing that their workers' compensation awards were settlements, and not the result of an evidentiary hearing. Neither objection was raised at trial and these issues are waived.

¶35 "If prejudicial remarks of counsel, or the admission of prejudicial evidence, is allowed to go to the jury without the aggrieved party moving the court to declare a mistrial, or otherwise permitting the trial court the opportunity to correct the asserted error, the party will be deemed to have taken his chances with the jury." Lawton Transit Mix, Inc. v. Larson, 1969 OK 83, ¶ 10, 455 P.2d 696. "[A]lleged prejudicial remarks of counsel in his argument to the jury are not preserved for review by this court unless objected to and exception is taken at the time the remarks are made." Lerma, 2006 OK 84, at ¶ 23. Any objection Plaintiffs may have had to Defendants' closing argument were not properly preserved and are not considered here.[15]

C. Objections to Purported "Hired Gun" Testimony Were Unpreserved

¶36 Plaintiffs also assert they are entitled to a new trial based on Defendants' questioning of Dr. Rosson regarding his relationship with Plaintiffs' counsel, how much he was paid by counsel, how long he had worked with counsel and whether he was aware that Mullen or his separate workers' compensation counsel would have received greater compensation with a higher impairment rating. Once again, we need not resolve this issue because Plaintiffs failed to object at trial.

¶37 The testimony at issue was presented through video depositions taken months in advance of trial and would have been no surprise to Plaintiffs. They have failed to point to any place in the record in which they objected to the subject testimony before it was played[16] or obtained and memorialized the trial court's ruling thereon, and this Court finds none. This issue is not preserved and is thus waived. See B-Star, Inc. v. Polyone Corp., 2005 OK 8, ¶ 17, 114 P.3d 1081 (all objections raised during video deposition, or reserved for presentation to judge at later time, must be made and ruled upon prior to playing the video for the jury. All arguments and rulings on those objections must be made a part of the record and transcribed for appellate review.).

D. To the Extent Preserved, the Damage Award is Not Inadequate 

¶38 Plaintiffs argue that the jury's damage award is unreasonably low or inadequate and clearly the result of alleged misconduct or passion and prejudice at trial. Phillips was awarded just over $6,000 and Mullen received $5,000. The amounts awarded are roughly 1% of what Plaintiffs' counsel suggested at trial. Notably, Plaintiffs now suggest Mullen was actually entitled to $2,882,075.04, and Phillips ought to have been awarded $1,345,956.48.

¶39 Plaintiffs arguably failed to preserve this issue in the trial court before perfecting appeal. Though a party need not file a motion for new trial to perfect an appeal pursuant to 12 O.S.2021, § 991(a), it has long been the case that propositions of error, with few exceptions, must be presented first to the trial court for correction to be preserved for review on appeal.

¶40 For instance, in Barnes v. Oklahoma Farm Bur. Mut. Ins. Co., 2000 OK 55, 11 P.3d 162, the Oklahoma Supreme Court considered whether a defendant's argument that a punitive damage award was excessive was properly preserved below. The Court recognized that section 991(a) does not require a party to file a motion for new trial, describing the intent of the statute as relieving a litigant, "who has already raised an issue in the trial court, of the burden of having to raise the same issue a second time through a motion for new trial." Id. However, the Court considered defendant's argument as a challenge to the sufficiency of evidence supporting the punitive damage claim, already preserved by demurrer, motion for directed verdict, and objections to jury instructions, and held the issue was sufficiently preserved without a motion for new trial. Id. at ¶ 39. See also Continental Natural Gas v. Midcoast Natural Gas, Inc., 1996 OK CIV APP 157, ¶ 13, 935 P.2d 1185 (lack of obligation to file a motion for new trial does not alter the rule that a party may not raise on appeal issues not first raised before the trial court).

¶41 Barnes plainly indicates that, even if a motion for new trial is not required before perfecting an appeal, an error must have been otherwise preserved. Plaintiffs did not object to the jury verdict and filed no motion for new trial. Ordinarily, to challenge the sufficiency of evidence supporting the verdict, like Defendants, Plaintiffs must move for directed verdict to preserve the issue for further review.[17] See e.g. Alliance Steel, Inc. v. Martin Yack Const. Co., Inc., 2001 OK CIV APP 121, ¶ 4, 34 P.3d 656. Plaintiffs moved for directed verdict on liability for negligence, which was granted, but did not move for directed verdict on damages. However, Plaintiffs sought only non-economic damages for pain and suffering, which required a jury to quantify (if Plaintiffs presented evidence of those damages). Thus, the available means to preserve an award for inadequate damages before the trial court in that instance appears to be a motion for new trial.[18] Thus, in the Court's opinion, this issue was not properly preserved, though we find no Oklahoma Supreme Court case which addresses this specific factual scenario. However, even if this issue can be raised for the first time here, we decline to overturn the trial court's judgment.

¶42 "Before a verdict of the jury will be set aside as excessive [or inadequate] it must appear that the verdict is so excessive [or inadequate] as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption." Park, 1973 OK 72, at ¶ 9. Plaintiffs offer three general arguments that the verdict was unduly influenced by passion or prejudice: one, that Plaintiffs' claims were erroneously tried together, which has no basis in law; two, defense counsel's alleged prejudicial statements, to which Plaintiffs failed to object; and three, argument that Plaintiffs' impairment was "uncontroverted," and thus the damages are without rational basis, reflecting passion and prejudice. This argument is inaccurate and unpersuasive.

¶43 Plaintiffs' impairment ratings were not binding on Defendants. Testimony presented by Plaintiffs that they were impaired was evidence in support of their injuries. However, though Defendants admitted Plaintiffs sustained some injury, the extent of their pain and suffering, as well the cause of the entirety of their injuries, was disputed by evidence at trial which the jury was entitled to consider.

¶44 Phillips presented evidence that he suffered a partial permanent disability in his neck as a result of the accident, as well as testimony that he was economically unemployable, and that he suffered constant pain. However, Phillips was impeached more than once at trial regarding his pre-accident condition and his assertion he had never been prescribed medication before the accident. Ultimately, after being confronted by his inconsistent statements, Phillips admitted he may have had some neck pain prior to the accident.

¶45 Evidence showed Phillips stopped going to physical therapy, though his records indicated it improved his pain, telling his own physician he did not need to work. At trial, Phillips testified he suffered such pain he could barely stand, yet he had not pursued any medical treatment in years, other than the arthritis medication he had been taking before the accident. A jury could have found from the evidence presented that Phillips' claims of significant pain from the accident were not credible, or that the bulk of his complaints were not attributable to the accident.

¶46 Mullen presented Dr. Rosson's testimony that his sprain/strain, or musculoligamentous injuries and disc bulges were caused by the accident, and to which he in part attributed Mullen's continued complaints of pain. However, that evidence was disputed by physicians who testified the condition of Mullen's spine was to be expected of a man of his age and profession, and/or that the condition of his spine was not caused by the accident. Though Mullen contended that his neck hurt "like hell" at trial, he had pursued no treatment for years, other than over-the-counter medication (though he did testify he was seeing a physician for pain relievers and muscle relaxers at the time of trial). Mullen had never been unable to work or placed on restriction. The jury could have concluded from the evidence that any injury and pain and suffering Mullen sustained as a result of the accident was minimal, that his injuries were not caused by the accident, or that his evidence of significant injury from the accident was not credible.

¶47 Though considerably lower than requested, the jury's verdict is not outrageous, shocking to the conscience or the apparent result of prejudice.[19] As stated above, the jury's verdict is conclusive as to disputed facts and conflicting statements. We will not overturn judgment thereon when there is "any competent evidence reasonably tending to support the verdict of the jury." C&H Power Line Construction Co. v. Enterprise Products Operating, LLC, 2016 OK 102, ¶ 16, 386 P.3d 1027. To the extent this issue was preserved, we will not overturn the jury's verdict here.

E. Directed Verdict on Punitive Damages

¶48 Finally, Plaintiffs assert that the trial court erred by granting Defendants a directed verdict on their claim for punitive damages, based on Almaguer's distracted driving, as well as NOV's reckless entrustment of the vehicle to one "NOV knew or should have known was likely to use the vehicle, or conduct itself to create an unreasonable risk of harm."

¶49 We review the record in the light most favorable to Plaintiffs and consider whether there was any competent evidence to support Plaintiffs' claim for punitive damages. Gillham, 2001 OK 41, at ¶ 7.

¶50 Pursuant to 23 O.S.2021, § 9.1, to allow an award for punitive damages there must be a showing, at a minimum, that defendant has acted in reckless disregard of another's rights from which malice and evil intent may be inferred. Payne v. DeWitt, 1999 OK 93, ¶ 10 n.17, 995 P.2d 1088. It is an issue of law for the trial court to determine, as gatekeeper, whether there is competent evidence upon which a reasonable jury could find reckless disregard. Badillo v. Mid Century Ins. Co., 2005 OK 48, ¶ 66, 121 P.3d 1080. The trial court did not err by withholding this issue from the jury.

¶51 First, Plaintiffs cite to no evidence of record that would support a negligent entrustment claim against NOV, let alone punitive damages. Plaintiffs presented no evidence of any prior accident of Almaguer, or any other basis upon which NOV could have concluded Almaguer was a careless, reckless or incompetent driver, let alone that NOV did so in reckless disregard of the rights of others, i.e., that NOV was aware, or did not care that there was a substantial and unnecessary risk that its conduct would cause serious injury to others, that its conduct was unreasonable under the circumstances with a high probability that its conduct would cause serious harm to others. See Instruction 5.6 (OUJI Supp. 2014); Gowens v. Barstow, 2015 OK 85, ¶ 20, 364 P.3d 644. This argument is entirely without basis in the record.

¶52 Plaintiffs' other arguments that punitive damages were warranted because Almaguer was under the influence, fatigued, or distracted by technology or was "recklessly distracted" by NOV for any failure to follow rules (to the extent such a claim would be viable) are also unsupported.

¶53 Plaintiffs presented no evidence at trial that Almaguer was under the influence of any illegal substance at the time of the accident.[20] However, Plaintiffs suggested at trial that NOV had spoliated evidence of a post-accident drug test, and argue the trial court erred by refusing to give an instruction on this basis, and/or to infer for itself the test showed drug or alcohol use. We disagree.

¶54 The basis of Plaintiffs' argument is two-fold. One, Almaguer thought he took a test, and two, Plaintiffs claimed NOV company policy required a test to be taken. Plaintiffs reasoned, therefore, that the test was not produced and would show Almaguer was under the influence at the time of the accident.

¶55 Almaguer testified in his deposition six years after the accident that he took a post-accident drug or alcohol test. Two years later, he testified at trial that he had been confused because he tested regularly at his next job. NOV's corporate representative Anderson testified that he would have been the person to take Almaguer for a test, and Almaguer did not take one. He also testified that, according to company policy, when authorities were called to investigate third party accidents, NOV relied on the authorities to conduct drug and alcohol testing.[21]

¶56 Plaintiffs argue this evidence was sufficient to suggest reckless disregard and submit punitive damages to the jury. However, if we view the foregoing as evidence a test was taken and not produced, the lack of drug test alone does not give rise to a reasonable inference that Almaguer was under the influence and acted in reckless disregard at the time of the accident.

¶57 To make that assumption, the trial court would have had to conclude that a test was conducted, Defendants willfully destroyed it, and to have inferred the result would have been unfavorable. Yet, though the trial court allowed Plaintiffs to explore the existence of the test at trial, Plaintiffs never demonstrated that Defendants "spoliated" the evidence such that they were entitled to such an inference.

¶58 Specifically, Plaintiffs never demonstrated that Defendants were under any legal obligation to retain the test at a time it was lost or destroyed, to the extent it existed, or that it was willfully destroyed, withheld or NOV failed to preserve it, and that Defendants had been sanctioned for those actions. See generally Akim v. Ben Milam Heat Air & Electric Inc., 2019 OK CIV APP 52, 451 P.3d 166; American Honda Motor Co. v. Thygesen, 2018 OK 14, 416 P.3d 1059; Barnett v. Simmons, 2008 OK 100, 197 P.3d 12; Instruction No. 3.11A (OUJI Supp. 2020).[22] The trial court clearly did not err in declining to instruct the jury on adverse inference. We cannot conclude the trial court thus erred by declining to infer itself that the drug test was unfavorable as a basis to submit punitive damages to the jury, particularly where no other evidence at trial suggested Almaguer was under the influence.[23]

¶59 Next, we give short shrift to Plaintiffs' argument that punitive damages should have gone to the jury because Almaguer was fatigued. Plaintiffs presented no evidence at trial that Almaguer was or appeared fatigued. Instead, Plaintiffs attempted to apply Department of Transportation driving hours regulations for motor carriers to Almaguer, a field service technician. DOT regulations did not apply. Almaguer drove to job sites to perform work but spent no more than an hour or two per day in the car. Though he worked 81 hours in the seven days prior to the accident, not all of those hours were spent driving. Almaguer worked nine hours the day before the accident. At the time of the accident, he had been working around eight hours. Almaguer testified he was not fatigued. Plaintiffs presented no evidence to the contrary, and no evidence Defendants violated any law or regulation applicable to Almaguer regarding the hours he worked. The trial court did not err in refusing to instruct the jury on this basis.

¶60 Similarly, the trial court did not err in refusing to instruct the jury based on a theory that Almaguer was distracted by "technology." Though Plaintiffs spent considerable time at trial questioning Almaguer's cell phone use and NOV's cell phone policy, Almaguer's cell phone records were presented at trial. There was no evidence Almaguer was using his phone at the time of the accident, to the extent it would suggest an inference of reckless disregard. Likewise, though Plaintiffs claimed Almaguer may have been entering a work ticket into a laptop fitted into his truck, Almaguer testified he was not using his laptop at the time of the accident, and Plaintiffs presented no evidence to the contrary.[24] In short, the entirety of Plaintiffs' distracted driving theory as a basis for punitive damages was speculative.

¶61 Finally, Plaintiffs argue that the trial court should have instructed on punitive damages because Almaguer drove at an "excessive speed" under the circumstances, as evidenced by his inability to stop at a clear distance from Plaintiffs' vehicle. Plaintiffs argument is contrary to the testimony of their own expert, admitting the accident occurred at slow speed.[25] In any event, Plaintiffs rely on the language of 47 O.S.2021, § 11-901, which states that "[i]t shall be deemed reckless driving for any person to drive a motor vehicle in a careless or wanton manner without regard for the safety of persons or property or in violation of the conditions outlined in Section 11-801(A)." Section 11-801(A) provides:

Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and any other conditions then existing. No person shall drive any vehicle upon a highway at a speed greater than will permit the driver to bring it to a stop within the assured clear distance ahead.

They reason that, because Almaguer was unable to stop and contacted their vehicle, he was in violation of section 11-801, and should be deemed reckless. Even if we were to accept Plaintiffs' interpretation of the statute,[26] they have failed to cite any authority supporting a proposition that competent evidence of reckless driving in violation of sections 11-801 and 11-901 automatically warrants an instruction on punitive damages. Reckless driving, as defined by statute, does not necessarily equate to the standard of reckless disregard of the rights of others required to impose punitive damages under 23 O.S.2021, § 9.1. The trial court did not err by declining to submit punitive damages to the jury on this basis.

CONCLUSION

¶62 We find no basis to reverse the jury's verdict in this case. For the foregoing reasons, we affirm the trial court's judgment of February 22, 2022.

¶63 AFFIRMED.

BARNES, V.C.J., and WISEMAN, P.J., concur.

FOOTNOTES

[1] Phillips also sued National Oilwell Varco, Inc. (NOV, Inc.) of which NOV was a subsidiary. NOV admitted Almaguer was its employee, acting in the course and scope of his employment. The trial court docket does not reflect that NOV, Inc. was ever served. Further, while the judgment itself does not dispose of that Defendant, the parties omitted any claim against NOV, Inc. from the Pretrial Order. The pleadings are deemed to be amended to conform to the Pretrial Order. See 12 O.S. Ch.2 App, Rule 5(i). No claim remains pending against NOV, Inc.

[2] Negligent entrustment was added at the time of the Pretrial Conference.

[3] Almaguer agreed at trial Plaintiffs were approximately 200 yards ahead of him when he first saw them. Plaintiffs appeared to contend his prior deposition testimony that when he crested the hill, "bam," Plaintiffs' vehicle was "right there" and the accident happened in the snap of a finger, to mean that he did not slow, or else he should have been able to avoid the collision.

[4] Plaintiffs' counsel suggested the heavy steel bumper was so dented, the damage had to be pulled out with a frame, but Plaintiffs presented no evidence on that point at trial.

[5] Phillips exhibited a pre-existing spontaneous spinal fusion at the C4-C5 vertebra, advanced degenerative arthritis, bone spurs and bilateral neural foramen narrowing.
Dr. Reynolds testified that Phillips could not go back to normal because his spine was not normal. He testified Phillips' symptomology could be caused by a variety of issues but, based on the information available to him, his symptoms began at the time of the accident, and were thus related.

[6] Rosson conducts independent medical examinations and disability assessments in workers' compensation proceedings. Rosson appears to have been ordered to perform an independent medical examination of Phillips in the workers' compensation proceeding but appears to have been retained as Mullen's expert in the workers' compensation action.

[7] Phillips saw Dr. Fong in relation to the workers' compensation proceeding. According to Dr. Rosson, Dr. Fong had concluded the collision was not the major cause of Phillips' symptoms. According to Dr. Reynolds, Fong recommended an anterior cervical discectomy. Though Dr. Reynolds did not think the recommendation unreasonable, he thought more conservative care was appropriate. Phillips acknowledged Dr. Rosson's testimony that he was 53% impaired prior to the accident.

[8] Dr. Foster described a schmorl's node as an erosion or implosion of the end plate of a vertebra from pressure from the disc either above or below it.

[9] The MRI showed, among other things, a mild 2mm disc bulge at the T6-7 without canal stenosis, a 3mm focal central disc protrusion indenting the anterior thecal sac at the T9-10 without significant central canal stenosis, a small schmorl's node at the inferior plate of T8 with the impression of "1. No acute compression deformity of the thoracic spine. 2. Mild disc degenerative changes of the mid thoracic spine. 3. Mild disc bulging or protrusions at T6-7 and T9-10 without significant central canal stenosis."

[10] Dr. Rosson testified musculoligamentous injury means pulls, stretching, tearing of the muscles, ligaments, soft tissues. Neurosensory injury means an injury to the nerves or nerve roots innervating portions of the spine, based on Mullen's complaint of ongoing neck pain radiating into shoulders and head, causing headaches, numbness, and tingling of hands and fingers, i.e., radiculopathy. While he testified he diagnosed neurosensory injury based on Mullen's subjective complaints, he also tied radiculopathy to disc injuries and pressure on the nerves in his impairment rating.

[11] Plaintiffs refer in their Brief in Chief to percentages of impairment set forth in Workers' Compensation orders which were not made part of the record at trial and are thus improperly included in an Appendix on appeal, which we therefore do not consider. See. Okla. S.Ct. Rule 1.11(i).

[12] Defendants argued they were entitled to a directed verdict on punitive damages at the close of Plaintiffs' evidence, and the trial court's judgment sets forth that it granted a directed verdict. Technically, the trial court granted Defendants' demurrer to Plaintiffs' evidence on this issue.

[13] Defendants did comment in opening that "you'll hear evidence that a semi truck was making that turn as [Plaintiffs] were approaching, which caused them to suddenly stop short of the stop sign." Plaintiffs moved for a mistrial because Defendants had admitted fault. The court overruled the objection. Defendants continued, informing the jury immediately thereafter that "[w]e're not suggesting that Mr. Mullen had any other options than to stop short. His stopping short though was caused from a semi that was turning, encroaching on the lane." Contrary to Plaintiffs' statements in appellate briefing, Defendants did not thereafter argue that the accident was unavoidable. They argued that the accident "was just that, it was an accident." At that time, Plaintiffs were pursuing punitive damages against Defendants, as well as a negligent entrustment claim based on contentions that NOV had entrusted its vehicle to one it knew or had reason to know was a careless, reckless or incompetent driver. Defendants were entitled to address and dispute Plaintiffs' arguments that they acted recklessly, even if fault was admitted.

[14] Plaintiffs vaguely suggest the jury was misled by the term "accident," stating "[t]his collision was no accident." We surmise Plaintiffs believe the mention of an "accident" is inconsistent with Defendants' liability for negligence, when they have admitted fault. Defendants repeatedly told the jury they were at fault. No citation of authority is required to recognize that many commonly refer to a traffic collision as an "accident." While one's liability generally sounds in negligence and the breach of one's ordinary duty of care, the collision itself and resulting damage might be considered an accident or accidental, if devoid of intent to injure or damage another. See e.g. Penley v. Gulf Ins. Co., 1966 OK 84, ¶ 23, 414 P.2d 305 (discussing the meaning of accident under an insurance policy; distinguishing feature of an accident is "the distinctive event or determinable, unexpected happening. . . . ;" damage was accidental under policy, though caused by negligence, where tortfeasor did not intend to cause damage). Defendants' reference to the collision as an accident was not misleading on the issue of fault, though Plaintiffs disputed that characterization.

Notably, Defendants did argue in closing they were not reckless, even after directed verdict was entered on punitive damages. Plaintiffs' negligent entrustment claim remained pending. Even if this were not the case, we question whether such commentary would be considered prejudicial when offered in response to Plaintiffs' closing argument, which continued to argue without evidentiary support that Almaguer was distracted, i.e. "reckless," by his cell phone, fatigue, etc., and which also encouraged the jury to reach a verdict based on Defendants' "fake repentance" and alleged lack of apology. "Improper remarks used by counsel in
argument . . . are not ground for reversal where the language was provoked by remarks of counsel for the adverse party, unless it appears quite plainly that the verdict was influenced thereby." Lerma, 2006 OK 84, ¶ 17. However, as addressed, we need not resolve these issues where Plaintiffs waived them at trial.

[15] Plaintiffs argue that Defendants' alleged misconduct entitles them to a new trial under 12 O.S.2021, § 651 and § 1031. Motions for new trial and motions to vacate are to be made in the trial court. Plaintiffs filed no such motion. On appeal, we "may reverse, vacate or modify judgments of the District Court for errors appearing on the record." Indep. Sch. Dist. # 52 of Oklahoma Cnty. v. Hofmeister, 2020 OK 56, ¶ 52, 473 P.3d 475, 497, as corrected (July 1, 2020). "We require parties to preserve error with proper argument and authority, or the error is waived for the appeal." Id.

[16] Though irrelevant, Plaintiffs also made no objection after the video was played, or at any time during the trial.

[17] Further, to raise an error in a motion for new trial, one must ordinarily also preserve the error during the course of trial. See e.g. Capshaw v. Gulf Ins. Co., 2005 OK 5, ¶ 13, 107 P.3d 595. However, there appear to be some exceptions. See e.g. Burkett v. Moran, 1965 OK 165, 410 P.2d 876 (plaintiff's objection to inconsistency of verdict was substantive as opposed to an objection to form of the verdict, and thus not waived for failure to raise before jury was discharged; plaintiff appealed from motion for new trial where issue was raised); G.H.K. Co. v. Janco Investments, Inc., 1987 OK CIV APP 68, 748 P.2d 45.

[18] While there are numerous cases from Oklahoma courts addressing an argument that the verdict is inadequate, the issue appears to typically have been preserved through a motion for new trial. See e.g. Davis v. Potts, 1957 OK 40, 308 P.2d 268; Park v. Security Bank and Trust Co., 1973 OK 72, 512 P.2d 113; Vickers v. Ittner, 1966 OK 175, 418 P.2d 700.

[19] Apart from the evidence, Plaintiffs' request for hundreds of thousands of dollars in noneconomic damages, along with unsupported but extensive focus on distracted driving, admonitions of Defendants' fake repentance, and references to such notions as the Defendants' "mockery of human suffering" may also have had a deleterious effect on Plaintiffs' credibility.

[20] The trial court granted a "directed verdict" at the close of Plaintiffs' evidence, before the investigating Oklahoma Highway Patrol trooper testified in Defendants' case. The trooper testified he interviewed Almaguer for ten to fifteen minutes and noticed nothing that made him think Almaguer was impaired.

[21] NOV's testing policy stated it required a post-accident drug and alcohol test after "all single NOV vehicle accidents and multiple vehicle accidents involving NOV vehicles only or as required by D.O.T. or NOV Legal Department." Plaintiffs contended this policy required a drug and alcohol test after every accident, and thus insisted one must have been conducted and withheld.

[22] The Notes on Use accompanying OUJI Instruction No. 3.11A in effect in 2021 provide that an adverse inference instruction "may be used if the court has imposed a sanction for spoliation of evidence. In order to give this Instruction, the trial court must first find that there was a duty to preserve the evidence in issue and that a party willfully destroyed, withheld, or failed to preserve the evidence" citing American Honda and Barnett.

[23] We also decline to find the trial court erred by granting a directed verdict because Almaguer had taken a Xanax the evening before the accident, without some evidence that Almaguer would have been, and appeared to be, impaired the next day.

[24] Plaintiffs' theory was that Almaguer used a laptop located in his truck to enter work tickets or assignments as they were received and may have been entering a ticket while driving down the road. However, they presented no evidence of such a ticket or his laptop use at the time of the accident. An incident report indicated Almaguer was on his way to another service call at the time of the accident. However, no ticket for that assignment was produced, and Defendants apparently did not produce information from Almaguer's laptop. Plaintiffs speculated that Almaguer would have created a ticket for the next assignment, possibly while driving, and that Defendants later spoliated that evidence by reimaging Almaguer's laptop 30 days after he left his employment pursuant to company policy before suit was ever filed. Plaintiffs were permitted to question NOV and suggest at trial that NOV had declined to provide data from Almaguer's computer. NOV testified that everything dealing with the case had been presented. Almaguer did not go another job because of the accident. He testified he never entered the information for the next assignment. His work tickets indicated his next stop was the shop. Anderson testified laptops were useless without the internet, and thus drivers logged in to wifi located on well sites. Even considering evidence in the light most favorable to Plaintiffs, there is nothing of record that actually suggests Almaguer could have entered a ticket while driving or did so, or that NOV spoliated that information to support their speculative theory.

[25] For this same reason, we reject Plaintiffs' argument that punitive damages should be left to the jury because Almaguer testified he was driving 45 m.p.h. at the time of the collision. Almaguer's testimony was that he had been driving 45 m.p.h., but slowed before the collision, as Plaintiffs' own accident reconstruction expert admitted.

[26] Motor vehicle accidents and human error are two of the true constants in life. Though the Court need not resolve this issue, it seems unlikely the Legislature intended that every failure of an individual to stop in time to avoid a collision would be deemed "reckless" driving under section 11-901(A), subjecting drivers to fines and imprisonment under section 11-901(B), as well as punitive damages.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
1987 OK CIV APP 68, 748 P.2d 45, 58 OBJ 2614, 
G.H.K. Co. v. Janco Investments, Inc.
Discussed

 
2001 OK CIV APP 121, 34 P.3d 656, 72 OBJ 3097, 
ALLIANCE STEEL, INC. v. MARTIN YACK CONSTRUCTION CO., INC.
Discussed

 
2019 OK CIV APP 52, 451 P.3d 166, 
AKINS v. BEN MILAM HEAT AIR & ELECTRIC INC.
Discussed

 
1996 OK CIV APP 157, 935 P.2d 1185, 68 OBJ 1297, 
CONTINENTAL NATURAL GAS, INC. v. MIDCOAST NATURAL GAS, INC.
Discussed

 
1981 OK CIV APP 69, 637 P.2d 908, 
Burgess v. Friedman & Son, Inc.
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1993 OK 6, 847 P.2d 342, 64 OBJ 420, 
Graham v. Keuchel
Discussed

 
1997 OK 7, 933 P.2d 282, 68 OBJ 306, 
Florafax International, Inc. v. GTE Market Resources, Inc.
Discussed

 
2001 OK 33, 23 P.3d 288, 72 OBJ 1479, 
DAVIS v. CMS CONTINENTAL NATURAL GAS, INC
Discussed

 
2001 OK 41, 24 P.3d 858, 72 OBJ 1495, 
GILLHAM v. LAKE COUNTRY RACEWAY
Discussed at Length

 
1957 OK 40, 308 P.2d 268, 
DAVIS v. POTTS
Discussed

 
1965 OK 165, 410 P.2d 876, 
BURKETT v. MORAN
Discussed

 
1966 OK 84, 414 P.2d 305, 
PENLEY v. GULF INSURANCE COMPANY
Discussed

 
1966 OK 175, 418 P.2d 700, 
VICKERS v. ITTNER
Discussed

 
2002 OK 50, 49 P.3d 732, 
COMPUTER PUBLICATIONS, INC. v. WELTON
Discussed

 
2002 OK 60, 52 P.3d 1014, 
MYERS v. MISSOURI PACIFIC RAILROAD CO.
Discussed

 
1969 OK 83, 455 P.2d 696, 
LAWTON TRANSIT MIX, INC. v. LARSON
Discussed

 
1995 OK 131, 907 P.2d 1067, 66 OBJ 3765, 
Jackson v. Jones
Discussed

 
1973 OK 72, 512 P.2d 113, 
PARK v. SECURITY BANK AND TRUST COMPANY
Discussed at Length

 
2005 OK 5, 107 P.3d 595, 
CAPSHAW v. GULF INSURANCE COMPANY
Discussed

 
2005 OK 8, 114 P.3d 1082, 
B-STAR, INC. v. POLYONE CORPORATION
Cited

 
2005 OK 48, 121 P.3d 1080, 
BADILLO v. MID CENTURY INSURANCE COMPANY
Discussed

 
2006 OK 15, 131 P.3d 116, 
STATE v. ONE THOUSAND TWO HUNDRED SIXTY-SEVEN DOLLARS
Discussed at Length

 
2006 OK 84, 148 P.3d 880, 
LERMA v. WAL-MART STORES, INC.
Discussed at Length

 
2007 OK 76, 171 P.3d 890, 
SPENCER v. OKLAHOMA GAS & ELECTRIC COMPANY
Discussed

 
2008 OK 100, 197 P.3d 12, 
BARNETT v. SIMMONS
Discussed

 
1975 OK 9, 539 P.2d 735, 
WAGNON v. CARTER
Discussed

 
2015 OK 85, 364 P.3d 644, 
GOWENS v. BARSTOW
Discussed

 
2016 OK 102, 386 P.3d 1027, 
C&H POWER LINE CONSTRUCTION CO. v. ENTERPRISE PRODUCTS OPERATING, LLC
Discussed

 
2018 OK 14, 416 P.3d 1059, 
AMERICAN HONDA MOTOR CO. v. THYGESEN
Discussed

 
2020 OK 56, 473 P.3d 475, 
INDEPENDENT SCHOOL DISTRICT # 52 v. HOFMEISTER
Discussed

 
1999 OK 93, 995 P.2d 1088, 70 OBJ 3452, 
Payne v. DeWitt
Discussed

 
1981 OK 106, 634 P.2d 718, 
Berry v. Empire Indem. Ins. Co.
Discussed

 
2000 OK 55, 11 P.3d 162, 71 OBJ 3219, 
BARNES v. OKLAHOMA FARM BUREAU MUTUAL INS. CO.
Discussed

 
1986 OK 21, 719 P.2d 824, 57 OBJ 1207, 
Bode v. Clark Equipment Co.
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 991, 
Right to Perfect Appeal to Supreme Court without Filing Motion for New Trial - Exemption
Cited

 
12 O.S. 2018, 
Joinder of Claims and Remedies
Cited

Title 23. Damages

 
Cite
Name
Level

 
23 O.S. 15, 
Several Liability - Civil Action Based on Fault, Not Arising Out of Contract
Cited

 
23 O.S. 9.1, 
Damages for Sake of Example and Punishment of Defendant - Punitive Damages Awards by Jury
Discussed

 
23 O.S. 13, 
Comparative Negligence
Cited

Title 47. Motor Vehicles

 
Cite
Name
Level

 
47 O.S. 11-901, 
Reckless Driving
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA